UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| LA'MONN HARRIS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) NO. 1:15-cv-00114 |
| | ) CHIEF JUDGE CRENSHAW |
| THE CITY OF LEWISBURG, | ) |
| TENNESSEE and BUCK BEARD, | ) |
| | ) |
|     Defendants. | ) |

## MEMORANDUM OPINION

La'Monn Harris, an African-American, filed this action against the City of Lewisburg, Tennessee ("Lewisburg" or "the City") and Buck Beard, his former supervisor, arising from his employment with the City. (Doc. No. 14.) Before the Court is Defendants' motion for summary judgment. (Doc. No. 26.) For the reasons below, this motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

On March 3, 2011, former Public Works Director Kenny Ring hired Harris to work as a Laborer for the City of Lewisburg. (Doc. No. 38 at ¶¶ 1-2.) In December 2013 or January 2014, Buck Beard became Public Works Director. (Id. at ¶ 4.) According to Harris, "things changed drastically." (Id.) For example, Beard explained that he used profanity at his first meeting with the Laborers. (Doc. No. 38 at ¶ 5; Doc. No. 43 at ¶ 17.) Harris asked Beard what to do if Beard "cussed at him," and Beard responded that Harris should "just cuss him back." (Doc. No. 38 at ¶ 6.)

Harris and other employees complained about work assignments. (Doc. No. 43 at ¶ 14.) However, Harris believes that Beard scrutinized him more because he would disagree with work assignments. (Doc. No. 38 at ¶ 7.) Beard signed four "supervisory note[s] to file" because Harris

questioned work assignments and created a difficult work environment within the department. (Doc. No. 43 at ¶ 64.) These notes do not constitute corrective action under Lewisburg's progressive discipline policy. (Id.)

### A. February 9 Telephone Conversation between Harris and Beard

At 6:17 a.m. on February 9, 2015, Harris called Beard to tell Beard he could not come to work because his son had the flu. (Doc. No. 38 at ¶ 10.) At the end of the call, Harris overheard Beard refer to him as an "SOB." (Id. at ¶ 12; Harris Dep. at 49-51.[1]) Around 6:30 a.m., Harris called Beard again and repeatedly yelled and cursed at Beard for calling him an "SOB." (Doc. No. 27-4 at 4.[2]) Beard then recommended that Harris's employment be terminated. (Doc. No. 27-4 at 4.)

### B. February 10 Statements to the City Council

On February 10, 2015, Harris complained to the Lewisburg City Council about disparate and harassing treatment by Beard. (Doc. No. 40-1 at 44; Doc. No. 43 at ¶ 1.) Harris wrote that Beard's cursing and "name-calling" created a "hostile work environment." (Doc. No. 40-1 at 44.) According to Defendants, Harris did not refer to harassment based on any protected class in his oral statement.[3] (Doc. No. 38 at ¶ 16.) However, Harris believes that "[t]he story itself is pretty much discrimination," and he thought the Council was "under the impression that I was really talking about race, because of some of the things I was telling them . . . ." (Harris Dep. at 298-99.)

---

[1] Both Plaintiff's and Defendant's submissions of Harris's deposition transcript (Doc. Nos. 27-1 and 39-1) are referred to herein as "Harris Dep. at ____." The page numbers after page 100 of Harris's deposition are incorrectly numbered, and the lower number on each page is the correct number. (Doc. No. 38 at ¶ 9 n.1).

[2] Defendants cite an audio recording that Harris purportedly made of this telephone call. The Court granted Defendants leave to manually file an audio CD containing this recording (Doc. No. 30), but the docket sheet reflects that the clerk's office has not received any such audio CD. Thus, the record before the Court on summary judgment does not contain audio recordings of this call.

[3] Defendants again cite an audio recording that Harris purportedly made of the City Council meeting. As stated above, the record before the Court on summary judgment does not contain audio recordings.

Lewisburg City Manager Randall Dunn signed a separation notice on February 11 to discharge Harris for "[i]nsubordinate misconduct, creating a hostile work environment." (Dunn Dep. at 75-77;[4] Doc. No. 27-6 at 21.) Dunn testified that he prepared the notice after Beard informed him that Harris was argumentative and insubordinate. (Dunn Dep. at 75-76.) Beard and Dunn testified that the notice was prepared on February 10, before Harris talked to the City Council. (Beard Dep. at 96-97; Dunn Dep. at 76.) Nevertheless, the City decided not to give Harris the notice because it could appear to be retaliation for his statements to the City Council. (Doc. No. 43 at ¶ 3.)

The City investigated Harris's claims for "unlawful harassment, disparate treatment and discrimination." (Id. at ¶ 4.) As a result of the investigation, Dunn signed a "supervisory note to file," acknowledging that Beard used "inappropriate and/or foul language" and that he had a problem controlling his temper with employees. (Doc. No. 43 at ¶ 7; Doc. No. 40-1 at 45.) Beard was told that these problems would not be tolerated and he was required to attend sensitivity training. (Doc. No. 43 at ¶ 7; Doc. No. 40-1 at 45.) The investigation "found no evidence" to support Harris's allegation of discrimination and harassment. (Doc. No. 40-1 at 45.) On April 4, 2015, the City informed Harris of the findings from its investigation. (Doc. No. 43 at ¶ 4.)

### C. Harris's Medical Leave

Lewisburg's employee handbook contains a policy regarding the Family and Medical Leave Act. (Dunn Dep. at 18-19.) Lewisburg does not have a written policy regarding the Americans with Disabilities Act, or how an employee requests an accommodation. (Doc. No. 43 at ¶¶ 20-21.) The practice is that the employee should ask the City Manager. (Id. at ¶¶ 20-21.) The City requires individuals that suffer injuries while employed by the City to "have a 100 percent

---

[4] Both Plaintiff's and Defendant's submissions of Dunn's deposition transcript (Doc. Nos. 27-5 and 39-3) are referred to herein as "Dunn Dep. at ____."

release from their doctor without restrictions before they come back to work." (Dunn Dep. at 25-26.)

On May 3, 2015, a brown recluse spider bit Harris's left arm, which became infected. (Doc. No. 43 at ¶¶ 26-27.) On May 4, the City approved Harris for FMLA leave. (Id. at ¶¶ 26, 40.) Dunn knew Harris was on FMLA leave and that Harris submitted requests to return from leave on June 19, July 7, and July 17, 2015. (Id. at ¶¶ 25, 28.) Dunn did not talk to Harris about whether he could perform the essential functions of his job, but denied his requests to return to work with any restrictions in place under the City's "100% healed" policy. (Id. at ¶¶ 36-37.)

### D. Return from Medical Leave

Harris returned on to work on July 20 without any restrictions. Two days later, Harris and Beard had an argument due to Harris's end-of-the-day notice that he had to go to court the next day. (Beard Dep. at 125-27.) Beard told him not to come to work at all and the argument intensified between them. (Id.) Beard eventually told Harris to bring a note reflecting when he arrived at court and the time he left. (Harris Dep. at 183-84, 370.) Harris remained upset.

On July 23, Beard met with Harris and fellow employee Henry Foster about productivity. (Doc. No. 43 at ¶ 45.) Yet another altercation began when Beard asked Harris about a gap in his work time after Harris's lunch break. (Doc. No. 40-1 at 49.) Harris became upset and argumentative. (Id.) He left Beard's office and entered the break room where other employees were located. (Id.) Beard followed him. (Id.) Harris pointed his finger and walked at Beard in a threatening manner, warning Beard that he would get what is coming to him. (Id.) Beard told Harris to go home and report to City Hall at 8:30 a.m. (Id.) Harris refused and told Beard to call the police if he wanted. (Id.) Beard called "911" and reported that an employee threatened him,

4

refused to leave the building, and that Beard feared for his life. (Id.) Police arrived after Harris left. (Id.)

### E. Harris's Termination

Dunn is responsible for personnel issues. (Doc. No. 43 at ¶ 44.) He testified that he learned of the July 23 altercation when Beard called him at home. (Dunn Dep. at 87-88.) Dunn interviewed several employees about the incident. (Id. at 88-89.) He did not discuss the altercation with Harris. (Doc. No. 43 at ¶ 47.)

On July 23, the City terminated Harris's employment. (Id. at ¶ 62.) The separation notice stated that "employee made a physical threat," insubordination, poor job performance, and that Harris refused to leave the premises. (Id.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). In deciding a motion for summary judgment, the Court must review all the evidence, facts and inferences in the light most favorable to the nonmoving party. Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The Court determines whether sufficient evidence has been presented to make the material issue of fact a proper jury question. Id. The mere existence of a scintilla of evidence in support of the nonmoving

party's position will be insufficient to survive summary judgment; rather, there must be evidence on which the jury could reasonably find for the nonmoving party. Rodgers, 344 F.3d at 595.

### III. ANALYSIS

Harris asserts claims against the City and Beard for discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and retaliation in violation of the First Amendment, the ADA, and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* ("THRA"). Harris asserts claims against the City for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"), interference and/or retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and violation of the Tennessee Public Employee Political Freedom Act, Tenn. Code Ann. § 8-50-603 ("PEPFA").

Defendants move for summary judgment on all of Harris's claims. In response, Harris concedes his FMLA interference and Section 1981 claims (Doc. No. 37 at 2 n.1), and does not address Defendants' arguments on Harris's claims under the ADA or the First Amendment against Beard. Harris's only specific reference to his ADA discrimination claim is that he "agrees with the legal elements of an ADA discrimination claim as set forth by Defendants." (Id. at 12, 13 n.3.) Further, individuals cannot be liable for retaliation under the THRA. Tenn. Code Ann. § 4-21-301(b) ("No individual employee or agent of an employer shall be liable for any violation of part 4 of this chapter that any employer shall be found to have committed.").

Accordingly, the Court will dismiss Harris's claim against the City and Beard in his individual capacity for ADA discrimination, Harris's claims against the City for FMLA interference and violation of Section 1981, and Harris's claims against Beard in his individual capacity for First Amendment retaliation, ADA retaliation, THRA retaliation, and failure to

6

accommodate under the ADA. There are no remaining claims against Beard in his individual capacity.

## A. Harris's Termination Claims

## 1. First Amendment Retaliation

To establish a First Amendment retaliation claim, Harris must prove that:

(1) he engaged in constitutionally protected conduct;

(2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and

(3) the adverse action was motivated at least in part by his protected conduct.

Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531, 539 (6th Cir. 2012) (quoting Fritz v. Charter Tp. of Comstock, 592 F.3d 718, 723 (6th Cir. 2010)). Lewisburg concedes that Harris's dismissal was an adverse action, but argues that (1) Harris did not engage in constitutionally protected speech; and (2) even if he did, Harris's dismissal was motivated by his "insubordinate outbursts" rather than any protected speech. (Doc. No. 35 at 15-16.)

"[C]itizens who enter government service 'must accept certain limitations on [their] freedoms,' including limitations on the scope of their First Amendment rights." Fox v. Traverse City Area Pub. Sch. Bd. of Educ., 605 F.3d 345, 348 (6th Cir. 2010) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). For a public employee's speech to be constitutionally protected, he or she must satisfy the following requirements:

> First, the employee must speak on matters of public concern. Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. Third, the employee must show that his speech interest outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

Mayhew v. Town of Smyrna, Tenn., 856 F.3d 456, 462 (6th Cir. 2017) (internal citations and quotations omitted). Whether a public employee's speech is protected by the First Amendment is

7

a question of law. Id. at 464. Lewisburg does not dispute that Harris's statements were made as a private citizen. Instead, it argues that Harris did not address matters of public concern and that its interest in controlling the workplace outweighed Harris's speech interests. (Doc. No. 35 at 16.)

"The 'boundaries of the public concern test are not well defined.'" Mosholder v. Barnhardt, 679 F.3d 443, 449 (6th Cir. 2012) (quoting San Diego v. Roe, 543 U.S. 77, 83 (2004)). "It is not 'necessary for the entire expression to address matters of public concern, as long as some portion of the speech does.'" Id. (quoting Westmoreland v. Sutherland, 662 F.3d 714, 719 (6th Cir. 2011)). A "meaningful inquiry . . . calls for looking into 'the content, form, and context of a given statement, as revealed by the whole record,' and determining whether the employee predominantly spoke 'upon matters only of personal interest' or upon matter of public concern." Mosholder, 679 F.3d at 449-50 (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). It is well-established that complaints about "racially discriminatory policies involve[] a matter of public concern." Garceau v. City of Flint, 572 F. App'x 369, 371 (6th Cir. 2014) (quoting Connick, 461 U.S. at 146).

When viewed most favorably to Harris, the Court concludes that there is sufficient evidence that Harris addressed matters of public concern on February 10, 2015 because he complained about racial discrimination. Indeed, the record reflects that he was "making a formal claim of disparate and harassing treatment by my immediate superior[], Buck Beard . . . ." According to Harris, his oral statement was a complaint of racial discrimination because "[t]he story itself is pretty much discrimination," and the Council was "under the impression that I was really talking about race, because of some of the things I was telling them . . . ." (Harris Dep. at 298-99.)

8

To be sure, Harris's speech also contained personal grievances against his supervisors, but an employee's motive for speaking does not "dispositively determine whether that individual's speech addresses a matter of public concern. . . . ." See Handy-Clay, 695 F.3d at 544 (quoting Chappel v. Montgomery Cty. Fire Prot. Dist. No. 1, 131 F.3d 564, 574 (6th Cir. 1997)). That Harris made statements "publicly to the City Council, rather than in a memo sent solely to his superior, supports th[e] conclusion" that he was not addressing matters only of personal interest. See Westmoreland, 662 F.3d at 720 (citing Haynes v. City of Circleville, Ohio, 474 F.3d 357, 364 (6th Cir. 2007)).

Harris also satisfies "Pickering 'balancing'—that [his] interests . . . as a citizen, in commenting upon matters of public concern' . . . outweighed [Lewisburg's] 'interest . . . as an employer, in promoting the efficiency of the public services it performs.'" Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch, Dist., 624 F.3d 332, 338-39 (6th Cir. 2010) (quoting Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill., 397 U.S. 563, 568 (1968)). Lewisburg argues that it had an interest in "maintain[ing] control of the workplace and the appropriate behavior of its employees." (Doc. No. 35 at 16.) However, the City does not explain how Harris's statements interfered with its ability to maintain control of the Public Works Department. Again, viewing the facts in a light most favorable to Harris, the Court concludes that material factual disputes exist as to whether Harris's interest in addressing racial discrimination outweighed Lewisburg's interest in an efficient workplace.

Finally, Harris must show that his protected conduct was "a substantial or motivating factor in [Lewisburg's] decision to" terminate his employment. See Handy-Clay, 695 F.3d at 545 (quoting Hughes v. Region VII Area Agency on Aging, 542 F.3d 169, 181 (6th Cir. 2008)). This is a question of "fact, suitable for resolution by a jury unless just one resolution is

9

reasonable." Devlin v. Kalm, 630 F. App'x 534, 538 (6th Cir. 2015) (citing Rodgers, 344 F.3d at 602-03). Here, the separation notice is dated February 11, 2015—the day after Harris's statements to the City Council. Harris was to be discharged for "[i]nsubordinate misconduct, creating a hostile work environment." (Doc. No. 27-6 at 21.) While factual disputes exist as to when the letter was prepared, it is undisputed that the City decided not to give Harris the separation notice because it could appear to be retaliation for his statements to the City Council. There is not any evidence that the City's intention to terminate Harris changed after February 11. However, on July 23, the day of Harris's discharge, Harris and Beard had an altercation that may be sufficient to justify Harris's termination. Indeed, it could qualify as an independent legitimate non-retaliatory reason for Harris's discharge. See Benison v. Ross, 765 F.3d 649, 661 (6th Cir. 2014) (stating that the "occurrence of intervening events weakens the relationship" between activity protected by the First Amendment and an adverse action). As explained below, whether discharge for the July 23 altercation is justified is in dispute because it appears the City failed to follow its own progressive discipline policy. Again, taking the facts in light most favorable to Harris, a reasonable jury could conclude that Harris's complaints to the City Council was a "substantial or motivating factor" in his dismissal.

Accordingly, Defendants' motion for summary judgment will be denied on this claim.

**2.      Statutory Retaliation Claims**

Harris also asserts retaliation claims under Title VII, the THRA[5], the ADA, and the FMLA. Because Harris's claims are based on circumstantial evidence, the Court will analyze them using the McDonnell-Douglas burden-shifting framework. Thus, Harris bears the initial burden of

---

[5] The Court's analysis of Harris's Title VII retaliation claim applies to his THRA retaliation claim. See Frizzel v. Sw. Motor Freight, 154 F.3d 641, 646 (6th Cir. 1998) (citation omitted) ("The Tennessee Supreme Court has held that courts may use federal case law assessing claims under Title VII to analyze THRA claims.").

establishing, by a preponderance of the evidence, a prima facie case by showing that (1) he engaged in protected activity under each statute; (2) Lewisburg knew that he engaged in this protected activity; (3) Lewisburg took an adverse action against him; and (4) there was a causal connection between the protected activity and the adverse action. Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014) (citing A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013)) (ADA); Laster v. City of Kalamazoo, 746 F.3d 714, 730 (6th Cir. 2014) (citations omitted) (Title VII); Wade v. Automation Pers. Servs., Inc., 612 F. App'x 291, 300 (6th Cir. 2015) (citations omitted) (THRA); Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012) (quoting Killian v. Yorozu Auto. Tenn., Inc., 454 F.3d 549, 556 (6th Cir. 2006)) (FMLA). Lewisburg concedes that Harris's dismissal was an adverse action, but argues that he did not engage in protected activity, it was unaware of any protected activity, and there was no causal nexus between any protected activity and Harris's dismissal. (Doc. No. 35 at 9-11, 21.)

### a. Protected Activity

For an activity to be protected under Title VII, Harris "must establish that he challenged an employment practice that he reasonably believed was unlawful." Yazidian v. ConMed Endoscopic Techs., Inc., 793 F.3d 634, 645 (6th Cir. 2015) (citation omitted). Harris made statements to the City Council about a pattern of disparate treatment, harassment, and coarse language, and specifically wrote that he was subjected to a "hostile work environment." "[A]n employee who complains that an employer is creating a 'hostile work environment' engages in Title–VII–protected activity when the context objectively reveals that the employee is using the expression to complain about repeated abusive discriminatory comments or treatment." Id. at 646. A reasonable jury could conclude that the context objectively reveals that Harris complained to the City Council about ongoing racial discrimination.

11

Additionally, Harris engaged in protected activity under the FMLA by requesting and taking leave for a spider bite on May 4, 2015, and protected activity under the ADA by requesting accommodations to return to work while on leave. A.C. ex rel. J.C., 711 F.3d at 698. He has satisfied the first element of his prima facie claims for retaliation.

### b. Knowledge

Although Lewisburg argues that it was unaware of any protected activity, there is no genuine dispute that the City knew that Harris complained to the City Council, submitted requests for accommodations to the City, and that the City approved his FMLA leave.

### c. Causation

Harris must prove his Title VII, ADA, and FMLA retaliation claims under the "but-for" causation standard. Laster, 746 F.3d at 731 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013)); E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 770 (6th Cir. 2015) (en banc) (applying Nassar to ADA retaliation claim); Sharp v. Profitt, 674 F. App'x 440, 451 (6th Cir. 2016) ("[I]t seems that FMLA retaliation requires a showing of but-for causation."). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Laster, 746 F.3d at 731 (quoting Nassar, 133 S. Ct at 2533).

Harris does not present any evidence establishing that there was a causal connection between his ADA requests for accommodation and his termination. The Court will therefore grant Defendants' motion for summary judgment on the ADA retaliation claim.

As to his Title VII claim, a reasonable jury could conclude that Harris would not have been discharged "but-for" his complaints about racial discrimination to the City Council. Harris spoke to the City Council on February 10, 2015, and was terminated on July 23, 2015, after Harris was

on medical leave for about two-and-a-half months. When Harris's leave time is excluded, Lewisburg discharged Harris about three months after his complaint to the City Council, and this temporal proximity supports a finding of causation when coupled with additional evidence. See Nguyen v. City of Cleveland, 229 F.3d 559, 567 (6th Cir. 2000) (quoting Parnell v. West, 114 F.3d 1188, 1997 WL 271751, at *3 (6th Cir. 1997)) ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months."). The City completed a separation notice dated February 11—the day after Harris's statements to the City Council. There is no evidence that Lewisburg's intention to terminate Harris changed after February 11. Although the July 23 altercation between Harris and Beard may have been sufficient to justify Harris's dismissal, the record suggests that the City did not follow its progressive discipline policy. Taking the facts in the light most favorable to Harris, a reasonable jury could find that his Title VII protected activity was a "but-for" cause of his termination.

As to his FMLA claim, a reasonable jury could conclude that Harris would not have been discharged "but-for" taking FMLA leave based on temporal proximity. In considering FMLA retaliation claims, "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283-84 (6th Cir. 2012) (quoting DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004)). Lewisburg approved Harris's FMLA leave on May 4, Harris returned to work on July 20, and Lewisburg dismissed Harris on July 23. Again, excluding his medical leave time, the proximity between his exercising FMLA rights and termination is sufficient to "meet the low threshold of proof necessary to establish a

prima facie case of retaliatory discharge." Id. at 283 (holding that termination three weeks after returning to work and less than two months after taking leave satisfies the causation element of a prima facie case for FMLA retaliation) (collecting similar cases).

### d. Legitimate Non-Retaliatory Reason and Pretext

Because Harris has established prima facie cases of Title VII, THRA, and FMLA retaliation, the burden of production shifts to Lewisburg to present evidence of a legitimate, non-retaliatory reason for terminating Harris. Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993)) (FMLA); Yazidian, 793 F.3d at 650 (citing Hamilton v. Gen. Elec. Co., 556 F.3d 428, 435 (6th Cir. 2009)) (Title VII). Lewisburg has carried its burden by articulating that it dismissed Harris due to his actions and behavior on July 23, 2015. (Doc. No. 35 at 12-13.)

Thus, Harris must establish that Lewisburg's stated reason is pretext for unlawful retaliation. Seeger, 681 F.3d at 285 (citing Bryson, 498 F.3d at 570) (FMLA); Yazidian, 793 F.3d at 650 (citing Shazor v. Prof'l Transit Mgmt., Ltd., 744 F.3d 948, 957 (6th Cir. 2014)) (Title VII). Harris can do so by showing that Lewisburg's reason: (1) had no basis in fact; (2) did not actually motivate Harris's termination; or (3) was insufficient to motivate the action. Seeger, 681 F.3d at 285 (citing Dews v. A.B. Dick Co.,, 231 F.3d 1016, 1021 (6th Cir. 2000)) (FMLA); Yazidian, 793 F.3d at 651 (citing Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 349 (6th Cir. 2015)) (Title VII).

Harris offers the following evidence to rebut Lewisburg's reason on his Title VII and FMLA claims: (1) after his statements to the City Council, Harris's supervisors instructed his co-workers to monitor his work; (2) Beard allegedly told Harris while he was on FMLA leave that Harris "still [had] 12 days. I can't do nothing to you right now" (Harris Dep. at 232); (3) after

Harris returned from FMLA leave but before he was terminated, Harris was subjected to heightened scrutiny and performance quotas that were not applied to other employees; (4) Dunn did not verify Beard's account of the July 23 altercation with Harris or other employees before terminating Harris; and (5) Dunn failed to apply Lewisburg's progressive discipline policy at the time of his discharge. (Doc. No. 37 at 20-21, 23-24.)

Viewing the facts in a light most favorable to Harris, a reasonable jury could conclude that the City's proferred reason for terminating Harris, his conduct on July 23, was pretext for Title VII and FMLA retaliation. Not only is there a factual dispute as to what took place on July 23, which the Court must construe in the light most favorable to Harris, it is also undisputed that Lewisburg has a progressive discipline policy that the City deviated from in its termination of Harris. The City does not argue that the July 23 altercation was an event that warranted deviating from this policy. Lewisburg's failure to follow the progressive discipline policy is an issue of material fact from which a reasonable jury could conclude that the July 23 altercation was insufficient to actually motivate Harris's dismissal. See Lamer v. Metaldyne Co. LLC, 240 F. App'x 22, 33 (6th Cir. 2007) (citing Harrison v. Metro. Gov't of Nashville and Davidson Cty., Tenn., 80 F.3d 1107, 1117 (6th Cir. 1996)) ("Evidence that the progressive-discipline policy asserted as a rationale for an employee's termination was not uniformly applied is evidence of pretext.").

The Court will therefore deny Defendants' motion for summary judgment on Harris's Title VII, THRA, and FMLA retaliation claims.[6]

---

[6] Lewisburg also argues that Harris's FMLA retaliation claim should be dismissed because he "received all of the FMLA leave to which he was entitled," (Doc. No. 35 at 21), but that does not prevent the City from retaliating against him for doing so. See Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 283-87 (6th Cir. 2012) (analyzing an FMLA retaliation claim under McDonnell-Douglas where the plaintiff "received all of the FMLA leave to which he was entitled").

15

3. **PEPFA**

The Tennessee Public Employee Political Freedom Act provides: "It is unlawful for any public employer to discipline, threaten to discipline or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official." Tenn. Code Ann. § 8-50-603(a). The Tennessee Court of Appeals has explained that the causation element of a PEPFA claim is the same as the causation element of a THRA retaliation claim. See Gooch v. City of Pulaski, No. M2006-00451-COA-R3CV, 2007 WL 969398, at *6 (Tenn. Ct. App. Mar. 30, 2007). "[A] plaintiff making a retaliation claim under the THRA 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'" Goree v. United Parcel Serv., Inc., 490 S.W.3d 413, 440 (Tenn. Ct. App. 2015) (quoting Nassar, 133 S. Ct. at 2534). Thus, Harris must prove his PEPFA claim under a standard of "but-for" causation.

Here, Harris worked for Lewisburg, communicated with the City Council, and was later discharged. For the reasons stated above regarding the causation element of his Title VII claim, and regarding the pretext analysis of his Title VII retaliation claim, material factual disputes exist as to whether these communications were a "but-for" cause of his discharge. Defendants' motion for summary judgment will therefore be denied on this claim.

B. **ADA Failure to Accommodate**

The ADA provides that employers must make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A). To establish a prima facie failure-to-accommodate claim under the ADA, Harris must show that: (1)

he was disabled; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) Lewisburg knew or had reason to know about his disability; (4) he requested an accommodation; and (5) Lewisburg failed to provide the necessary accommodation. Deister v. Auto Club Ins. Ass'n, 647 F. App'x 652, 657 (6th Cir. 2016) (citation omitted). Lewisburg does not contest the first three elements, but argues that Harris did not request an accommodation, and he received reasonable accommodation in the form of leave. (Doc. No. 35 at 22.)

Here, Harris proposed returning to work with accommodations at least three times. Dunn did not have any specific conversations with Harris about whether he could perform the essential functions of his job, and Dunn would not allow Harris to return to work with any restrictions. Indeed, Dunn testified that the City requires employees who suffer injuries to "have a 100 percent release from their doctor without restrictions before they come back to work." Multiple courts have held that a "100% healed" rule is a "per se" violation of the ADA. See McGregor v. Nat'l R.R. Passenger Corp., 187 F.3d 1113, 1116 (9th Cir. 1999) (collecting cases). The Sixth Circuit has explained that "a 100% rule is impermissible as to a disabled person—but one must first be disabled."[7] Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir. 2001).

In short, Lewisburg did not know—or go through the required process to find out—whether Harris could have returned to work with accommodations. Lewisburg categorically rejected his requests in accordance with its "100% healed" policy. Thus, a reasonable jury could conclude that Lewisburg violated the ADA. See Keith v. Cty. of Oakland, 703 F.3d 918, 929 (6th Cir. 2013) (quoting Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 871 (6th Cir. 2007)) ("The duty to

---

[7] The Court has serious questions as to whether Harris was disabled under the ADA. However, Lewisburg does not contest the issue, and "where the 100% rule is applied to mildly impaired persons to exclude them from a broad class of jobs, it may be treating them as disabled even if they are not, thereby qualifying them for protection under the ADA . . . ." Henderson v. Ardco, Inc., 247 F.3d 645, 653 (6th Cir. 2001). Thus, the Court will assume for purposes of summary judgment that Harris was disabled under the ADA.

engage in the interactive process with a disabled employee is mandatory and 'requires communication and good-faith exploration of possible accommodations.'"). Defendants' motion for summary judgment on Harris's ADA failure-to-accommodate claim will therefore be denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 26) will be **GRANTED IN PART** and **DENIED IN PART**.

The Court will enter an appropriate order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE